FILED
JAN 17 2020
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARMIN MEMBERS,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN LIBRARY ASSOCIATION,<br><br>Defendant. | 1:20-cv-00412<br>Judge Manish S. Shah<br>Magistrate Judge Maria Valdez<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, for her cause of action against Defendant, state as follows:

### PARTIES

1. Plaintiff, Charmin Members, is an adult African American female who currently resides in the District of Columbia, and was a resident of the state of Illinois for the entire time of all of the events herein stated.

2. Defendant, American Library Association ("ALA") is a not-for-profit corporation organized in the state of Massachusetts, and is registered as a foreign corporation in the State of Illinois. Upon information and belief, its principal place of business is located at 50 East Huron Street, Chicago, Illinois 60611.

### JURISDICTION AND VENUE

3. Plaintiff brings her complaint under federal question jurisdiction, 28 U.S.C. § 1331, as the arguments raised within are based on federal law.

4. Venue in this district is proper under 28 U.S.C.S. § 1391(b)(2), because a substantial part of the events that give rise to the action occurred in this district.

## STATUTE OF LIMITATIONS

5. This action is timely pursuant to Title VII, which informs the time period to file a lawsuit is within ninety days (90) after receipt of the Notice of Right to Sue. 42 U.S.C.A. § 2000e. Plaintiff received her Notice on October 19, 2019.

## FACTS

6. During fourth quarter of 2016, Defendant hired Plaintiff to fill the newly created role Manager of Leadership Development. The Public Library Association ("PLA") is a division of the Defendant. The Manager of Leadership Development position falls under Defendant's PLA division.

7. Upon information and belief, during 2016, PLA submitted a grant proposal to the Global Libraries Initiative of the Gates Library Foundation.

8. Upon information and belief, the goal of the Global Libraries Initiative is to "support the transformation of libraries as engines of development;" and one of the four avenues that the Global Libraries Initiative utilizes to accomplish its goal is leadership training, and the focus of PLA's legacy framework is leadership development.

9. The purpose of the Manager of Leadership Development position is to implement the leadership development goals that were outlined in PLA's legacy framework, and one of the primary responsibilities of this role is to manage the Leadership Academies.

10. Upon information and belief, the grant would cover the entire salary of the full-time manager for up to six (6) years, and then cover approximately one half (1/2) of the salary from years seven (7) to ten (10).

11. It was Plaintiff's understanding that this newly created role was fully funded by a grant, with more than fifty percent (50%) of those ten (10) years funded at full-time.

12. On or about August 29, 2016, Plaintiff began her position at the PLA as the new Manager of Leadership Development, at a salary of seventy thousand dollars ($70,000) with the availability of yearly two percent (2%) salary increases. Additionally, after six (6) months of successful job performance, Plaintiff would be able to seek the opportunity to work remotely up to four (4) days per week.

13. Shortly after commencing her new position, Plaintiff was given her expected fiscal year 2017 goals, and she was tasked with managing her first Leadership Academy in March 2017, and a second in December 2017.

14. Based on the required independent evaluation assessment that must be performed to rate the success of each Leadership Academy, the March 2017 leadership academy was successful.

15. After six months of employment, Plaintiff submitted a request to work remotely three (3) days per week to her superior manager, Mary Hirsh ("Manager Hirsh"), Caucasian.

16. At the time that Plaintiff submitted her request, there were other PLA managers who worked remotely three (3) or more days a week.

17. Specifically, the Manager of Continuing Education who performed duties substantially equivalent to that of the Plaintiff worked remotely three (3) days a week. Based on this prior custom, Plaintiff understood that three (3) days a week was the acceptable norm for employees performing similar responsibilities.

18. However, Manager Hirsh informed Plaintiff that she could only work remotely up to two (2) days a week due to the importance of her role, and the high probability that Plaintiff might be needed at a meeting.

19. Plaintiff questioned Manager Hirsh's reasoning, by highlighting the fact that other employees, all of whom are Caucasian, work remotely more than two (2) days a week. Plaintiff explained that if she was needed to be physically present for a meeting, she could work from home before and/or after the meeting.

20. In October 2017, Manager Hirsh completed a performance review for Plaintiff's performance from September 2016 through August 2017, and rated Plaintiff as "meets expectations" for every category except "communication."

21. Manager Hirsh's reason for rating Plaintiff as below expectations was because she felt that Plaintiff needed major improvement; since as Manager Hirsh claimed that she "often do[es] not know what [Plaintiff] is doing unless [she] physically walks over to [Plaintiff's] office and ask."

22. The cumulative score of the performance review fell just below a three (3), which meant that Plaintiff's overall performance was below expectations. Such a rating would disqualify Plaintiff from being qualified to work remotely, and from receiving her annual two percent (2%) salary increase.

23. Plaintiff was shocked and dismayed by the poor performance evaluation, and thus she submitted a formal request to Manager Hirsh to reconsider the rating on October 20, 2017.

24. Since Manager Hirsh refused to reconsider the performance rating, Plaintiff submitted a formal complaint to Human Resources on December 12, 2017, outlining why she believed that

she had been subjected to different terms of employment and discriminated against based upon her race.

25. On or about December 18, 2017, Plaintiff had a meeting with Executive Director of Human Resources Daniel Hoppe ("Director Hoppe") to discuss her formal complaint of race discrimination.

26. On or about December 20, 2017, Director Hoppe met with Plaintiff again, and at this meeting gave her an e-mail purporting to be from Executive Director of the PLA, Barbara Macikas ("Director Macikas") dated December 6, 2017; wherein she alludes to scheduling a meeting with Plaintiff to discuss the elimination of her position.

27. Director Macikas was also present at the December 20th meeting. At this meeting, Plaintiff was told that her allegations of racial discrimination were unfounded.

28. Plaintiff was given a severance agreement and told to hand over her I.D. At the conclusion of the meeting, Plaintiff was escorted out of the workplace.

29. On or about January 25, 2018, Plaintiff filed her EEOC charge of discrimination alleging that she was discriminated against because of her race, African American, and was subsequently retaliated against for complaining of race discrimination.

**COUNT I – RETALIATION**

30. Plaintiff restates and re-alleges paragraphs 1 through 29, and incorporates said paragraphs as if fully set forth under this Count and further alleges:

31. Plaintiff submitted a formal complaint to Human Resources outlining that she had been treated differently because of her race, African American.

32. Director Hoppe met with Plaintiff on or about December 18, 2017, to discuss her racial discrimination complaint in detail.

33. Merely two (2) days later, Director Hoppe and Director Macikas met with Plaintiff again, and informed her that her race discrimination claims were unfounded.

34. Furthermore, at the same meeting Plaintiff was informed that Director Macikas had decided to eliminate her position, and Plaintiff was terminated effective immediately.

35. The Defendant's reason for the termination of Plaintiff's employment is pretext.

36. The claim is unworthy of credence because Manager Hirsh herself had told Plaintiff that her position was so essential that it required her to work onsite at least three (3) days a week.

37. Further, Plaintiff's position was grant-funded, and the grant would be used to pay the entire salary for the Manager of Leadership Development for the first six (6) years of the grant, and then half of the salary for the remaining time up to ten (10) years.

38. Based on the length time that the salary of the position was funded, it is logical to deduce that Defendant intended this position to be a key long-term role in its organization.

39. Therefore, Plaintiff believes that she was retaliated against for opposing racial discrimination, and she prays that this Court grant her a monetary judgment to remedy the damages that she has suffered.

## COUNT II – RACE DISCRIMINATION

40. Plaintiff restates and re-alleges paragraphs 1 through 39, and incorporates said paragraphs as if fully set forth under this Count and further alleges:

41. Plaintiff is an African American female, who has demonstrated that she satisfactorily performed her job as outlined in the fiscal 2017 goals assigned to her, and nowhere in the poor performance review does it state that she failed to accomplish any of these goals.

42. Plaintiff was subjected to more scrutiny than her peers, as Manager Hirsh would regularly join in unannounced on conference calls, attend Plaintiff's scheduled meetings, and consistently appear in her office to check up on her.

43. Further, Manager Hirsh rarely added any substance to the conference calls or meetings, which clearly show that she was only there to watch over Plaintiff.

44. When Plaintiff asked for permission to work remotely three (3) days a week as her peers did, she was told that she had to be in the office at least three (3) days a week because Plaintiff's role was so essential, and because she might have to attend meetings.

45. Based on a review of the job duties and responsibilities of the Manager of Leadership Development position, it appears many of the tasks can be performed from a home office.

46. If Plaintiff had a meeting scheduled, she agreed that she would physically be in attendance at the office to participate in the meeting.

47. Manager Hirsh's reasons for not allowing Plaintiff to work remotely the same amount of days as the other managers that reported to her are disingenuous.

48. It is more likely that the real reason is that of which Manager Hirsh stated in the performance review under the "communication" category, that she had to get up and walk over to Plaintiff's office frequently to inquire about what she was working on.

49. If Plaintiff was away from the office, then Manager Hirsh would not have the ability to shadow her.

50. In addition, the timing of the poor performance review is suspicious because it occurred shortly after Plaintiff questioned Manager Hirsh's denial of her permission to work remotely three (3) days a week.

51. The poor performance review was punishment because it prevented Plaintiff from being qualified to receive a raise and to work remotely.

52. The reasons provided by Manager Hirsh in the performance review are wholly pretextual and at times contradictory.

53. If Plaintiff was truly underperforming, there should be an easily identifiable job related deficiency.

54. However, Manager Hirsh rests her assessment on Plaintiff not speaking up in staff meetings enough, not displaying enough interests in what other employees are working on, and on not taking on a more active role during the Leadership Academies.

55. Comments like these show that Manager Hirsh was evaluating Plaintiff from the point of view of her own implicit bias regarding members of the African American race.

56. Such biased notions are of the sort that would lead Manager Hirsh to believe that she must keep a close eye on Plaintiff.

57. Further, such complaints were not raised during the review period to offer Plaintiff an opportunity to correct any performance deficiencies, and such action creates an inference of pretext.

58. Therefore, Plaintiff believes that she was discriminated against based on her race, and was discharged from employment due to her race, African American; and she prays that this Court enter judgment in her favor.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Charmin Members prays that this Honorable Court grant her the following relief:

1. An award of compensatory damages for the harm that she suffered, including front and backpay;

2. An award of reasonable attorney's fees and legal costs; and

3. Any other relief that this Court deems equitable and just.

Respectfully Submitted,

Dated: January 15, 2020

_____
Charmin Members, *Pro se*

Charmin Members
ADDRESS
TELEPHONE
EMAIL ADDRESS

EEOC Form 161 (11/16)     **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To: **Charmin Members**
c/o Sherry H. Joseph, Esq.
Joseph Law Office
1512 E. 71st Place, Unit 2
Chicago, IL 60619

From: **Chicago District Office**
230 S. Dearborn
Suite 1866
Chicago, IL 60604

[ ] On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| AMENDED 440-2018-01928 | Sarronda Harris, Investigator | (312) 872-9728 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

_Julianne Bowman_     10/17/19
**Julianne Bowman,
District Director**     (Date Mailed)

Enclosures(s)

cc: **AMERICAN LIBRARY ASSOCIATION**
c/o Norma W. Zeitler
Barnes & Thornburg, LLP
One N. Wacker Drive, Ste. 4400
Chicago, IL 60606-2833

**EXHIBIT A**